MINNEAPOLIS & ST. PAUL SUBURBAN RAILWAY COMPANY v. MANI-
TOU FOREST SYNDICATE and Others.[1]

May 17, 1907.

Nos. 15,257—(177).

**Eminent Domain—Interurban Railway—Common Carrier—Articles.**

Petitioner's articles of incorporation authorized it to purchase, lease,
build, own, and operate suburban street railways extending from the lim-
its of the cities of St. Paul and Minneapolis to and into outlying cities,
towns, and villages within the state of Minnesota—one line beginning at
the easterly limits of St. Paul, and running thence in a northeasterly di-
rection through the village of North St. Paul, by White Bear Lake, to the
city of Stillwater; another line beginning at the southerly limits of St.
Paul, and extending thence in a general southeasterly direction to South
St. Paul; another line beginning at Camden Place, in Minneapolis, and
running thence in a northwesterly direction to the city of Anoka; another
line extending from the western limits of Minneapolis at a certain point,
and running thence in a westerly direction through the village of Hopkins
to Lake Minnetonka—the routes for such lines to be designated as shall
be determined upon by the company. Among its other stated powers is
the right to own and operate by electric or steam power such steamboats,
launches, or other boats as may be determined upon by the company upon
the lakes of Minnesota, and power to purchase and own stock or stocks of
suburban or other street railway companies, and to purchase or lease
railways within the state, and to lease, construct, and operate electric or
other power stations for the purpose of furnishing electric light or power.
*Held:*

1. As determined by the main purport of its articles, such corporation
is a work of internal improvement and a common carrier, and, its articles
having been executed in compliance with title 1, c. 34, G. S. 1894, was enti-
tled to exercise the right of eminent domain conferred by section 2592
thereof, even though the incorporators declared in the articles that they
proposed to incorporate under the provisions of title 2.

2. Such corporation is none the less a common carrier, as defined by
section 379, G. S. 1894, though its articles do not in terms prescribe that
one of its powers is to carry freight.

3. In determining under what title the corporation was organized, the
fact that the organizers denominated the proposed improvement a "street
railway" is not controlling, since it conclusively appears from the articles

[1]Reported in 112 N. W. 13.

that it was not the purpose of the company to construct and operate street, but interurban, railways from place to place.

### Same—Revised Laws 1905.

The right to exercise the power of eminent domain, conferred upon a corporation organized under title 1, c. 34, G. S. 1894, was not abrogated, but recognized, continued, confirmed, and re-enacted, by the provisions of the Revised Laws.

### Same—Crossing Railroad Tracks.

Section 2915, R. L. 1905, authorizing a railroad company to cross the tracks of another such company at points of intersection, and to acquire such easement by condemnation, confers such right on all railroad corporations organized under the former statutes, as well as those organized under the Revised Laws.

### Occupying Streets.

The crossing of streets and alleys incidental to constructing a railroad from place to place does not constitute the occupancy of such streets or alleys for the purpose of operating a railway thereon, within the provisions of section 2841, R. L. 1905; and a railroad company has the right to acquire by condemnation, under section 2916, R. L. 1905, a right of way over the streets and alleys of cities and villages, and over private property within such limits, without securing a franchise from the municipal authorities.

Petition in the district court for Hennepin county for the appointment of commissioners to condemn certain lands for a right of way. The hearing was held before Simpson, Brooks, John Day Smith, and Fred V. Brown, JJ., who denied the petition. From the order denying the petition, petitioner appealed. Reversed.

*Munn & Thygeson* and *Koon, Whelan & Bennett,* for appellant.

The Century Dictionary defines "street railroad" as a railroad constructed upon the surface of a public street in towns and cities. The essential feature of a street railway is that it is an aid of the ordinary use of the street. That it is not an additional servitude upon the land adjoining the street upon which it is operated. For that reason it must necessarily follow the streets, it must necessarily be laid along the surface of the streets and not through cuts or on fills, for that would be a servitude upon the adjoining owner. It must derive its business from the street, otherwise it would not be an aid to the street. It must so operate its cars as not to exclude the ordinary uses of the

street by teams, vehicles, and by pedestrians, and for that reason street railways are required to so lay their tracks that the rails will not project above the level of the street or highway, and until recently all street railways were prohibited from using the so-called T-rail. The T-rail was itself a mark or sign of the railroad. T-rails are now used by street railways on condition that the space between the rails and on each side of the rails is so filled that the rails create no obstruction to the wheels of vehicles. The motive power is immaterial. Whether it carries passengers or baggage or freight is also immaterial, if that business is derived from the street. Carli v. Stillwater St. Ry. & T. Co., 28 Minn. 373; Newell v. Minneapolis, L. & M. Ry. Co., 35 Minn. 112; State v. District Court, 54 Minn. 34; Funk v. St. Paul C. Ry. Co., 61 Minn. 435; State v. Duluth G. & W. Co., 76 Minn. 96; City of Stillwater v. Lowry, 83 Minn. 275. See also Kline v. Minnesota Iron Co., 93 Minn. 63; Schus v. Powers-Simpson Co., 85 Minn. 447.

The power to carry freight does not change a street railway into a railroad or vice versa. Montgomery v. Santa Ana, 104 Cal. 186; Lewis, Em. Dom. § 115 (i); San Antonio v. Limburger, 88 Tex. 79; McQuaid v. Portland, 18 Ore. 237; Paquet v. Mt. Tabor, 18 Ore. 233; Chicago v. Whiting, 139 Ind. 297; Nichols v. Ann Arbor, 87 Mich. 361; Pennsylvania v. Montgomery, 167 Pa. St. 82, 90; Harvey v. Aurora, 174 Ill. 295; Hannah v. Metropolitan, 81 Mo. App. 78; Schaaf v. Cleveland, 66 Oh. St. 215; Baltimore v. Baltimore, 84 Md. 1; Heilman v. Lebanon, 180 Pa. St. 627; Chicago v. Milwaukee, 95 Wis. 561; Diebold v. Kentucky, 117 Ky. 146; Riggs v. St. Francois, 120 Mo. App. 335; Williams v. City Electric St. Ry. Co., 41 Fed. 556; Cedar Rapids v. Cummings, 125 Iowa, 430; Zehren v. Milwaukee (Wis.) 41 L. R. A. 575; Mordhurst v. Fort Wayne (Ind.) 66 L. R. A. 105, 115; Nellis, Acc. St. Ry. L. 9, note; Hinchman v. Paterson, 17 N. J. Eq. 75; 27 Am. & Eng. Enc. (2d Ed.) 5.

The following cases from other states illustrate the extent to which suburban companies exercise the right of eminent domain: In re Washington St., 115 N. Y. 442; In re Rochester Electric Ry. Co., 123 N. Y. 351; Malott v. Collinsville, C. & E. St. L. Ele. R. Co., 108 Fed 313; Ogden City v. Ogden City, 7 Utah, 207; Elliott, R. 11, note; Boyd v. Logansport, 161 Ind. 587; City of Chicago v. Rumsey, 87 Ill. 348; 15 Cyc. 574; Stewart v. Milwaukee, 110 Wis. 540; Adee v.

Nassau, 72 App. Div. 404; State v. Centralia-Chehalis, 42 Wash. 632; In re Eastern Wisconsin Ry. & L. Co., 127 Wis. 641; Union v. Base), 164 Ind. 249; Wabash v. Ft. Wayne, 161 Ind. 295; Cook v. Boon, 122 Iowa, 437; Kansas City v. Nelson, 193 Mo. 297; Wilder v. Aurora, 216 Ill. 493; Chicago v. Chicago, 211 Ill. 352; Richmond v. Seaboard, 103 Va. 399; Lewis, Em. Dom. § 956b.

The general power to build from Minneapolis to Minnetonka of itself gives the right to cross intervening railroads. Lewis, Em. Dom. §§ 268, 268a; In re Stillwater & M. St. Ry. Co., 171 N. Y. 589; section 2915, R. L. 1905; In re Minneapolis & St. Louis Ry. Co., 36 Minn. 481, 493; Stewart v. Wisconsin Central Co., 89 Fed. 617; Malott v. Collinsville, C. & E. St. L. Ele. R. Co., 108 Fed. 313.

*Belden, Jamison & Shearer,* for respondents Manitou Forest Syndicate and L. S. Gillette Company.

Appellant urges that its line is not a street railway line because it does not run on highways between Minneapolis and Excelsior. It is admitted that it crosses and parallels highways. Its claim seems to be that it is a street railway when it is on the streets, but when it is on its own private roadbed, it is a railway—a sort of kaleidoscope—one minute, when its cars are on a street, it is a street railway, and the next minute, when it is on its own roadbed, it is a railway. In considering this contention of appellant it must be borne in mind that a street railway is in aid of travel; that it is, hence, not an additional servitude upon the adjacent property. A street railway may, however, be in aid of travel, even though it be not located upon a street or highway. If the purpose of the line is to convey passengers, and the line is run in proximity to streets or highways, even though it be upon its own private roadbed, still it may be said to be operated in aid of travel. This being so it cannot successfully be contended that if the line is not run on the highway it is, hence, not a street railway. If appellant's contention is correct, then if, perchance, it should run a line for a long distance within a few feet of a highway, drawing travel therefrom, it must be regarded as a railway and not a street car line. This position of appellant leads to an absurd conclusion. The franchise received by it from the village of Excelsior simply permits it to operate its cars upon the streets thereof; it is specifically prohibit-

ed from carrying freight. If the company should attempt to exercise the functions of a commercial railway from Minneapolis into Excelsior and on its proposed extension to Birch Bluff, it would be obliged to haul freight through the village of Excelsior. By doing so it would impose an additional servitude upon the property adjacent to the streets in the village and would readily, at the instance of any property owner, be enjoined from so doing. When a commercial road occupies a street it must pay adjacent property owners' damages. The position of the company then is that it has the right to operate its road in such a way as to damage private property adjacent to the streets in the village of Excelsior, upon which it operates, without paying such property owners' damages. It is now asking the court to say that it can do something which it unquestionably could be enjoined from doing at the instance of property owners affected.

The company has heretofore operated its lines consistently with its purpose as designated in its charter. It has not regarded itself as amenable to the statutes of the state of Minnesota applicable to and governing the operation of railway lines; it has not established or published a schedule of rates as required of commercial roads by section 2012 of the code; it has at no time furnished to the railroad and warehouse commission the cost of construction of any line heretofore constructed, nor of the contemplated line, as required by law; neither has it furnished to such commission information as to its intended operation of any line as required of commercial roads by section 1984 of the code. Section 1005 of the code provides that railroad companies shall report gross earnings to the railroad and warehouse commission. This has never been done by appellant, and appellant does not contemplate so doing. The property of appellant has been returned for taxation in the manner controlling returns by street railway companies, as provided in section 829 of the code. The company does not maintain waiting rooms, or depots, or buildings of any character whatsoever, as required of railroad companies by section 2028 of the code. Section 2035 of the code also provides that toilet rooms shall be maintained on railway cars. Rooms of this character are not provided on the cars of appellant, and no platforms for loading or unloading freight, as required of railroad companies by section 2003, are maintained by appellant. The fact that these provisions of the law

have not been complied with indicates clearly that appellant has not regarded itself as operating anything other than a street railway.

The decisions of our own court clearly indicate a legislative distinction between street railways and the ordinary railway of commerce. The latter have the general right of eminent domain conferred; hence the effort on the part of appellant to establish that it should be regarded as a commercial road and not a street railway. Commercial railway companies may exercise this power, but street railway companies cannot exercise the same except outside of cities and villages, and not even there if chapter 350 of the Laws of 1899 is invalid, as contended for.

It is a well-established rule of law that a grant of the right of eminent domain must be strictly construed against the grantee. It would seem unnecessary to cite authorities upon this proposition. Counsel for appellant admit that because of the code provisions, the matter rests in some confusion. In their attempt to establish the contention that appellant has the right to exercise the power of eminent domain counsel are obliged to resort to much refining distortion of language and forced construction of statutes. This is hardly consistent with the rule which requires that the right to exercise this sovereign power must be given by clear and unambiguous language. By twisting and distorting code sections, counsel seek to escape the proviso to the effect that the power of eminent domain shall not be exercised by a street railway company within villages.

*George W. Seevers, John I. Dille* and *George C. True,* for respondent Minneapolis & St. Louis Railroad Co.

Three classes of cases have been cited by counsel in support of the petitioner's contention that it is a railroad and not simply a street railway:—(a) Cases where the question involved was that of additional servitude, where it was sought to escape the payment of compensation to abutting property owners on the ground that the road was a street railway;—(b) cases where the state sought to subject the defendants to the payment of a gross-earnings tax on the ground that the defendants were railroads and not street railways;—(c) cases where it was contended that the defendants were railroads and governed by the statutes making railroads liable for the negligence of its employees in the operation of trains. The bare statement of the subject-matter

of the cases referred to is sufficient to make it plain that the cases are not in point in this hearing. The question in all the cases mentioned was: Are the defendants doing a railroad business so as to bring them within the laws mentioned? The question was not: Have the defendants the right to do a railroad business under their articles of incorporation and the laws of the state? So that the authorities cited by counsel are of no consequence in this case, except as side lights upon the question of what is a "railroad" and what is a "street railway."

As evidence that the petitioner has deliberately selected title 2 for its organization, attention is called to the fact that the petitioner has incorporated for purposes for which it could not incorporate under title 1. Among the enumerated rights and powers of petitioner as stated in the articles of incorporation are the purchase and ownership of stock of suburban or other street railway companies and the purchase or lease of railway lines within the state of Minnesota. In the absence of statutory authority, one corporation has no right to acquire and hold by purchase stock of another corporation. 2 Elliott, R. § 374. There is nothing in the laws of this state that authorizes a street railway or a suburban railway, organized under title 1, to own stock of another corporation. Attention is also called to these articles of incorporation under which this company, without constructing, owning or operating a street railway, may yet lease, construct, own and operate electric lighting plants and be, for practical purposes, a corporation for that purpose only, and, under these articles, this company is authorized to deal in the stocks of street railways. No such power is conferred by title 1. In this connection it should be observed that all these things may be done under title 2, for under title 2 the corporation may do any lawful business.

Street railways are to be laid in the streets, avenues and highways and not to obstruct public travel. It seems to us it may be said with propriety that the articles of incorporation clearly contemplate that this railway is to be laid upon the highways and not across the farms of the country. Manifestly the incorporators intended to so incorporate as to be a street railway in the cities and towns through which its road would run, that would have the right to occupy the streets without the payment of damages to the abutting property owners. We think this a strong indication of the intention of the petitioner to

create a corporation for the operation of cars upon the streets and highways, and as an indication of no intention to claim the power that is now invoked in this case. Another thing strongly suggestive of this conclusion is the fact that the incorporators may have regarded the value of the right to condemn as insignificant as compared with the duties of and the burdens placed upon corporations that exercise the right of eminent domain, viz.: payment of damages to abutting property owners, payment of a gross-earnings tax, being subjected to liabilities under the fellow-servant law, supervision by the railroad and warehouse commission, and the regulation of rates, all of which provisions at the time of the incorporation were applicable to railroads and none of which were applicable to street railways.

Petitioner contends that the right of eminent domain and to cross the tracks of the Minneapolis & St. Louis Railroad Company exists under the revised laws of 1905. The sections of R. L. 1905, c. 58, that relate to the organization of corporations and their classification only relate to corporations hereafter created, and must be kept in mind in considering the new law. It is apparent however, after reading the entire chapter, that the legislature has meant to not only continue the distinction made between kinds of corporations and their powers that existed under G. S. 1894, c. 34, tit. 1 and 2, but has drawn the line even more sharply by providing in section 2846 that: "Corporations may be formed for any of the following purposes * * * or other lawful business not otherwise provided for in this chapter." As public service corporations are fully covered by another section of this chapter, it is clear that a corporation such as that we are considering could not be created under said section.

Section 2926 seems to be the section that counsel rely upon under the revised laws to give the petitioner the right of eminent domain. It will be observed the language of that section is: "Any public service corporation shall have the right to obtain by condemnation" * * *. It is plain, in view of the classification of corporations that has existed in this state from 1866 to the present time, that the reference in section 2926 to public service corporations must be a reference to corporations created under G. S. 1894, c. 34, tit. 1, and to corporations denominated "public service corporations" in the revised laws

of 1905, beginning with section 2891, and has no reference to corporations created under G. S. 1894, c. 34, tit. 2.

If it should be concluded that under any of the statutes considered the right of eminent domain exists, it does not follow that such right exists when it comes to crossing the tracks of a steam railroad. The old statute of eminent domain provided generally for the condemnation of private property other than that used for railroad purposes. It never had been the law in this state that one railroad company could by condemnation cross the tracks of another railroad company at any point it saw fit by simply paying the damages that would be sustained. The earliest legislation in this state recognized the importance of having such crossings at points where they would least interfere with the business of the road crossed, and under such circumstances as would best subserve the safety of the public. By G. S. 1894, § 2642, it was provided that one railroad may cross another railroad or connect therewith, but if the companies could not agree, then the district court should determine the place and the manner of crossing. By that section, the right to cross under the general provisions of the law of eminent domain was excluded, and the only way for one railroad to cross another by condemnation proceedings was to comply with this section. This law is re-enacted substantially in R. L. 1905, § 2915. At the time the original section on this subject was enacted, such a thing as a suburban railway was unknown, and the law as to condemnation proceedings had no relation to street railways. Throughout the chapters on railroads in both the old and the new law the word "railroad" is used. There is nothing in the new law to suggest that the word "railroad" as found in section 2915 and the various other sections preceding and following, has any relation whatever to any corporation other than a steam railroad, and the contention of this company is that, even though it be concluded that the power of eminent domain may be exercised by the petitioner over other private property, no such power exists when it comes to the crossing of steam railroads. The word "railroad" was used in these several sections long before the application of such sections to suburban or street railways could have been considered. Such railways are not embraced within the term "railroad," and there is no provision of law authorizing the condemnation proceedings in ques-

tion so far as the Minneapolis & St. Louis Railroad Company is concerned.

Should it be concluded that the right to condemn in the country exists, the further question remains, Is there any such right in villages?

If sections 2841 and 2842 refer to corporations that may in future be organized, and do not refer to corporations in existence at the time the law was passed, petitioner must rely upon R. L. 1905, § 2926. We have pointed out that this section manifestly refers to corporations that have been organized as "public service corporations" under G. S. 1894, c. 34, tit. 2, or as "public service corporations" under the revised laws of 1905, and has no reference to corporations organized purely as private enterprises, under G. S. 1894, c. 34, tit. 2. If it should be held that section 2841 applies to all corporations, without reference to the time when they were organized, then it follows that such corporations must comply with the clause of the section requiring that a franchise be first obtained from the city or village, and it will not be contended that there has been a compliance in this case. It will be observed that in the proviso in section 2842 there are no words of restriction. It is not stated that street railway companies hereafter organized shall not have the right of eminent domain in cities and villages, but the proviso applies to every street railway company without reference to when it was created.

LEWIS, J.

Appellant company, claiming to be organized under the provisions of title 1, c. 34, G. S. 1894, commenced this proceeding in the district court of Hennepin county for the purpose of condemning, in part, certain lands for a right of way within the corporate limits of the villages of Tonka Bay and Excelsior, in order to extend its line from Excelsior to Birch Bluff, on Lake Minnetonka.

The district court denied the application upon the following ground: "It appearing that some of the lands and tracts of grounds sought to be acquired by said petitioner through these condemnation proceedings are situate within the corporate limits of the village of Excelsior, and some thereof are situate within the corporate limits of the village of Tonka Bay, and it further appearing that said petitioner has no authority by law to acquire property by right of eminent do-

main within the limits of any city or village, and it further appearing that the tracts of land sought to be acquired situated outside of said villages would not be useful or necessary as a right of way, unless a right of way is acquired within said villages: Now, therefore, it is hereby ordered that said petition be, and the same is hereby denied."

The proposed improvement embraced the condemning of a right of way across the tracks of the Minneapolis & St. Louis Railroad, and that company answered, denying authority so to do. The Manitou Forest Syndicate answered, and alleged that the premises sought to be condemned were located in the village of Tonka Bay, in which village large quantities of land had been platted and the streets thereof were in use by the public, and that the proposed improvement would cross important streets and avenues of the village; that no franchise, license, or authority of any kind had ever been granted to the petitioner to make such improvements within the limits of the village. Respondent L. S. Gillette Company is the owner of certain tracts sought to be condemned, located in the village of Excelsior, and by its answer raised the same legal questions presented by the other respondents.

As we understand the order, the learned judges of the trial court were of opinion that appellant company was a street railway company, strictly speaking, and for that reason did not, under our statutes, possess the right to exercise the power of eminent domain within the limits of cities and villages. The solution of that question calls for a consideration of two propositions: First, as originally incorporated, was the company endowed with the right of eminent domain? Second, if it was, then was the power to exercise it within the limits of cities and villages denied by subsequent statutes?

1. The company was incorporated in June, 1899, and its general business is stated in the articles as follows:

> The general nature of the business of said corporation shall be to purchase, lease, build, own and operate suburban street railways, extending from the city limits of the cities of St. Paul and Minneapolis to and into outlying cities, towns and villages within the state of Minnesota; the following being among the lines of street railway which this corporation shall have

the right to either build or acquire by purchase or lease, and to own, operate and maintain after such building or acquisition.

Then follows a description of four separate lines of railway which it proposed to construct: One, from the easterly limits of the city of St. Paul, through the village of North St. Paul to Wildwood, on White Bear Lake, and thence from Wildwood to the city of Stillwater and the village of South Stillwater; another line, beginning at the southerly limits of the city of St. Paul, and extending thence in a general southeasterly direction to the city of South St. Paul; another line, beginning at Camden Place in the city of Minneapolis, and thence in a general northwesterly direction to the city of Anoka; and another line, which is the one involved in this proceeding, extending from the westerly limits of the city of Minneapolis, at or near the point where the Lake Harriet street railway line, if extended, would intersect the western city limits of the city of Minneapolis, and running in a westerly direction, along such route as shall be determined upon by the company, to the village of Hopkins, in Hennepin county, and thence through Hopkins, along and upon such route as shall be designated and determined upon, to Lake Minnetonka, and to such point or points on the lake as may be determined upon by the company. The articles also state that the company was incorporated,

> To lease, purchase or build, own, and operate such other line or lines of suburban street railway within the state of Minnesota as the board of directors of said company may determine upon hereafter. Also to lease, purchase, build, own and operate, by either electric or steam power, such steamboats, launches, or other boats as may be determined upon by said company, upon White Bear Lake, Lake Minnetonka, and such other lakes within the state of Minnesota as may be determined upon by the company. Also to lease, buy and own all real estate necessary for or incidentally connected with the building and operation of the street railway lines and the business herein provided for. Also to purchase and own stock or stocks of suburban or other street railway companies, and to

purchase or lease railway lines within the state of Minnesota. Also to lease, construct, own and operate electric or other power stations, electric lighting plants or stations, and in connection therewith to construct, maintain and operate electric lighting plants, and to furnish electric light or power to either persons, corporations, cities, towns or villages; and, generally, to do any and all things necessarily connected with or incidental to the business herein authorized and provided for.

Title 1, c. 34, § 2592, G. S. 1894, in part, reads as follows:

Any number of persons, not less than five, may associate for incorporation and become incorporated under and according to this title for the construction, maintenance and operation of any work or works of internal improvement requiring the taking of private property, or any easement therein, for public use, including railways, telegraph lines, etc. * * * But no corporation formed under this title shall have any right to construct, maintain or operate upon or within any street, alleys or other highway of any city or village, a railway of any kind * * * without first obtaining a franchise therefor from such city or village, according to the terms of its charter and without first making just compensation therefor, as herein provided.

If appellant was in fact incorporated for the construction, maintenance, and operation of a work of internal improvement, as provided by title 1, then it possessed the right of eminent domain, unless otherwise restricted. Respondents insist that appellant is foreclosed from raising the question by the very declarations of the articles of incorporation; that in the preamble it is declared that the incorporators associate themselves for the purpose of becoming a body corporate under and pursuant to the provisions of title 2; that the general nature of its business is to purchase, lease, build, own and operate street railways; that the company is operating between the city of Minneapolis and Excelsior a street railway, and its proposed extension from the latter point to Birch Bluff is also to be a

street railway; that, being a street railway, incorporated under title 2, the company never possessed the right of eminent domain, except without the limits of cities and villages, as authorized by chapter 350, p. 461, Laws 1899, approved April 20, 1899; and that even such right was extinguished by the express repeal of chapter 350, p. 461, Laws 1899, by the Revised Laws of 1905. So far as the formal acts of incorporation are concerned, the incorporators complied with the provisions of title 1, as well as with those of title 2. The articles contain all the requisites of sections 2593, 2594, tit. 1. The provisions of that title did not require the articles to state specifically that it was the purpose of the company to exercise the right of eminent domain. It was no less a common carrier because the articles did not state that its purpose was to carry freight. A common carrier is a corporation engaged in the transportation of persons or property within this state, etc. R. L. 1905, § 1990; G. S. 1894, § 379. It is clearly expressed in the articles that its business is to transport persons from place to place, and we need not now inquire whether the power and duty to carry freight is implied.

It is not controlling that the incorporators declared they proposed to incorporate under title 2, if in fact they did comply with and are incorporated under the provisions of title 1. In International Boom Co. v. Rainy Lake River Boom Corporation, 97 Minn. 513, 107 N. W. 735, it was held that a corporation cannot be made merely by being labeled as such, if its declared objects show it to be something else; that the real character of a corporation must be determined from those portions of its articles of association expressing the nature and scope of its business. State v. Minnnesota Thresher Mnfg. Co., 40 Minn. 213, 41 N. W. 1020, 3 L. R. A. 510.

Although the articles state that it is the purpose of the company to purchase, lease, build, own and operate street railways, the word "street" is not significant, because the context shows that the articles do not refer to that class of railways. The railways described in the articles are suburban railways, extending from the city limits of St. Paul and Minneapolis to and into outlying cities, towns, and villages within the state of Minnesota, viz.: From St. Paul to North St. Paul, White Bear, and Stillwater; from St. Paul to South St. Paul; from Minneapolis to Anoka; and from Minneapolis to Lake

Minnetonka. That district which lies adjacent to and outside the city limits is "suburban." The proposed railways are to run from the limits of the cities to distant cities and villages, through land where there are no streets; and hence the word "street" was not used in the articles for the purpose of limiting the corporation to the provisions of title 2. This becomes more apparent when we consider the characteristics of the two classes, commercial and street railways. What is a street railway? The Century Dictionary defines it as a railroad constructed upon the surface of a public street in towns and cities. 27 Am. & Eng. Enc. (2d Ed.) 5, states: "The distinctive and essential features of a street railway, as distinguished from other railroads, are the location of the road upon the surface of streets and highways, its mode of operation, and its use for the carriage of passengers." In Carli v. Stillwater St. Ry. & T. Co., 28 Minn. 373, 10 N. W. 205, 41 Am. 290, it was held that the construction and maintenance of a railroad operated by animal power upon a public street, for the main purpose of transferring freight cars between the termini of railroads, is the imposition of an additional servitude upon the street, so as to entitle the owner of a servient estate to compensation. The court held that it was not a street railroad, because its primary purpose was not for the accommodation of the public in that locality for the reception of passengers and freight along its line at any point on the street or alley, that the railroad was not located upon the street for the purpose of receiving business from the street, and that it was not in aid of the public travel for which the street was created; and attention was called to the fact that it was immaterial that the power employed was the same as generally in use by street railway companies at that time.

In Newell v. Minneapolis L. & M. Ry. Co., 35 Minn. 112, 27 N. W. 839, 59 Am. 303, the court distinguished Carli v. Stillwater St. Ry. & T. Co., supra, upon the ground that in that case the railroad in question was merely a connecting link between the termini of ordinary commercial railroads, and in no sense in aid of the street; whereas, in the Newell case, although the cars were propelled by steam motors, passengers were taken on or let off at any street crossing upon its line, the same as if it had been an ordinary horse railway, and

was operated in aid of the street and accommodating persons over the same. Upon this ground it was held that the railway was, within the city proper, a street railway, and consequently did not impose an additional burden upon the servient estate, and that it was immaterial that outside the city it ran upon its own track, the same as an ordinary steam railroad.

In Funk v. St. Paul C. Ry. Co., 61 Minn. 435, 63 N. W. 1099, 29 L. R. A. 208, 53 Am. St. 608, the same rule was applied, and it was held that the street railway company was not within the provisions of the fellow servant act. In that case the difference between "railroad" and "street railroad" was discussed, and it was stated that street railways get their business from the street, where passenger travel is the only business carried on.

Again, in State v. Duluth G. & W. Co., 76 Minn. 96, 78 N. W. 1032, 57. L. R. A. 63, the court called special attention to the fact that a street railway is local, and derives its business from the street along which it is operated, while a commercial railway usually derives its business either directly or indirectly through connecting roads from a large area of territory, and not from the travel on the streets.

These cases, and the authorities generally, clearly show that, while the reasoning varies somewhat according to the statutes in force in the different states, the distinction between the two classes of roads is well defined. The difference does not depend upon the motive power employed, nor alone upon the character of the cars, rails, or equipment. The essential and predominant distinction is that a street railway is operated upon the street in aid of the street as a highway. A street railway is an improvement on the coach or omnibus, and is operated for the use and benefit of persons desiring to be transported along the street. It is local, and under the special control of the municipality. A commercial railroad gathers its business at termini and operates from place to place. See Nichols v. Ann Arbor, 87 Mich. 361, 49 N. W. 538, 16 L. R. A. 371; Pennsylvania v. Montgomery, 167 Pa. St. 62, 31 Atl. 468, 27 L. R. A. 766, 46 Am. St. 659; Heilman v. Lebanon, 180 Pa. St. 627, 37 Atl. 119; Harvey v. Aurora, 174 Ill. 295, 51 N. E. 163; Hannah v. Metropolitan, 81 Mo. App. 78; 1 Lewis, Em. Dom. § 115h.

Reverting to the articles of incorporation, it will be noticed that among its purposes is the ownership and operation of other suburban railway lines within the state; to acquire, construct, own and operate, by electric or steam power, steamboats, launches, etc., upon the lakes in Minnesota, as may be determined upon; to purchase and own the stock of suburban or other street railway companies, and to purchase or lease railway lines within the state; to lease, construct, own, and operate electric or other power stations, electric lighting plants or stations, and in connection therewith to construct, maintain, and operate electric lighting plants, and to furnish electric light or power to either persons, corporations, cities, towns, or villages. While no doubt the construction and operation of electric and lighting plants is a business which might be organized under the provisions of title 2, and conceding there was no statutory authority for the purchasing by one corporation of another line of street railway, or stock therein, yet these purposes seem to be merely incidental to the main purpose, as expressed in the articles considered as a whole. At that time, however, so far as we are informed, the only authority conferred upon corporations to purchase or lease railroads, or the stock of other corporations, was as provided by sections 2714, 2715, tit. 1, c. 34, G. S. 1894, as amended. The question now before the court receives no enlightenment from the fact that the cars of appellant company are operated beyond the terminus of its line of the city limits, and by some arrangement are operated within the city upon the street railway tracks of some other corporation. It is of no material importance that, in operating its present line from Minneapolis to Excelsior, appellant uses the same equipment usually employed in operating street railways upon streets in villages and cities, and that it has not established depots or way stations, put up fences and signs at crossings, or, generally speaking, declared itself a railway within the provisions of the railroad and warehouse commission act. We are clearly of the opinion that appellant company was incorporated under title 1, possessing the right of eminent domain; but whether it has in all respects complied with the law as a common carrier is not involved in this proceeding.

2. We now come to the second division of the subject, viz.: Was the right of eminent domain conferred upon appellant by the provi-

sions of title 1, c. 34, G. S. 1894, abrogated or limited by the provisions of R. L. 1905, which went into effect March 6, 1906, before the commencement of these proceedings in condemnation?

Section 2838, c. 58, R. L. 1905, reads:

Existing Corporations Continued.

Until otherwise provided by law, all private corporations existing and doing business at the time of the taking effect of the Revised Laws shall continue to exercise and enjoy all powers and privileges possessed by them under their respective articles of incorporation, and the laws applicable thereto then in force, and shall remain subject to all the duties and liabilities to which they were then subject.

2841. Public Service Corporations.

Corporations may be organized, for the construction, acquisition, maintenance, or operation of any work of internal improvement, including railways, street railways, telegraph and telephone lines.  *  *  *  But no corporation so formed shall construct, maintain, or operate a railway of any kind, or any subway, pipe line, or other conduit in or upon any street, alley, or other public ground of a city or village, without first obtaining from, and compensating said city or village for a franchise conferring such right.

2842. State and Local Control—Eminent Domain.

The state shall at all times have the right to supervise and regulate the business methods and management of any such corporation, and from time to time to fix the compensation which it may charge or receive for its services; and every such corporation obtaining a franchise from a city or village shall be subject to such conditions and restrictions as from time to time may be imposed upon it by such municipality. Every such corporation may acquire, by right of eminent domain, such private property as may be necessary or convenient for the transaction of the public business for which it was formed: Provided, that no street railway company shall have or exercise such right within the limits of any city or village.

2926. Right of Eminent Domain in Certain Cases.

Any public service corporation shall have the right to obtain by comdemnation, under the right of eminent domain, any land, or any right over, through or across the same, or any easement therein, necessary for the convenient prosecution of its enterprise. * * *

Some confusion grows out of the fact that chapter 58, R. L. 1905, is a consolidation of titles 1 and 2, c. 34, G. S. 1894, but the revisers and the legislature expressly declared by section 2838 that all existing rights were continued until otherwise provided by law. Whatever powers appellant company possessed under title 1 were continued, unless the contrary appears. In section 2593, G. S. 1894, street railways were not specifically mentioned; but the right of eminent domain was conferred upon such roads outside of cities and villages by chapter 350, p. 461, Laws 1899. This chapter was expressly repealed by R. L. 1905; but the right to exercise the power was reserved to such companies by section 2841, where street railways are designated as works of internal improvement, and by section 2842 and section 2926, where the right of eminent domain is expressly conferred upon all such corporations. We discover nothing significant in the fact that the Revised Laws add "street railways" to the list of public service corporations with the right of eminent domain, and at the same time prohibit their exercise of the right within cities and villages by the proviso in section 2842. These provisions for the exercise of the right of eminent domain by street railways without the limits of cities and villages do not warrant the inference that it was the intention to withhold the right from corporations operating in the country lines of the street railway type; in other words, to wipe out the distinction theretofore existing between commercial and street railroads, except in cities and villages. Whether a corporation may be organized under the Revised Laws for the purpose of operating roads of the street railway type beyond the limits of cities and villages, without being subject to state control and the railroad and warehouse commission act, we need not inquire. Appellant company does not belong to that class. It is to all intents and purposes a common car-

rier, organized under title 1, and its rights and privileges have not been extinguished or limited by any subsequent statutes.

3. Respondent the Minneapolis & St. Louis Railroad Company insists there is no authority for appellant company to acquire the right of way over respondent's tracks. Most of the objections urged are based upon the assumption that appellant was organized as a street railway, strictly speaking, and require no special notice. In the petition appellant sets out the fact that it is necessary to cross respondent's railroad track at a certain point, and alleges that it has been unable to agree with that company upon the amount of compensation, or upon the character of the safety devices to be used at such crossing, and prays for the direction of the court with respect to that matter, alleging that it is the desire of appellant to condemn the easement and right to cross the railway at that point. Conceding that section 2642, G. S. 1894, made no provision, strictly speaking, for condemning an easement by one railroad company over the tracks of another, appellant is authorized to exercise such right by the provisions of section 2915, R. L. 1905; for the right conferred by the latter is not limited to companies organized thereunder, but extends to corporations organized under the former, unless otherwise provided.

4. Respondents further claim that it does not appear from the petition that the village authorities of Tonka Bay have conferred on appellant the right to occupy the streets and alleys in the village, as provided by section 2841. While it may appear from the petition that the proposed right of way will cross some of the streets, we are unable to discover that it is the purpose of appellant to occupy any of the streets, alleys, or public grounds within the village for the purpose of operating its railroad thereon. Section 2841 applies only where it is the intention to make use of the street or public ground for the purpose of operating such railway thereon; that is, upon or along the street. But, when it is the purpose to merely cross a street, alley, or public ground as an incident in the construction of a railroad through the country, then, under the provisions of section 2916, the right of way may be condemned, unless the company and public authorities otherwise agree as to the manner and terms of crossing. To hold that a franchise must be obtained as a prerequisite to crossing a highway, road, or street would put it in the power of the town,

village, or city authorities throughout the state to practically block railroad extension. Such is not our view of the statute, and, since it does not appear from the petition that appellant proposes to occupy any of the streets, alleys, or public grounds of the village of Tonka Bay for the purpose of operating its railway thereon, it does not become necessary to obtain a franchise or right for that purpose from the village authorities; and it is unnecessary to discuss whether such franchise must be obtained as a prerequisite to maintaining the condemnation proceedings with respect to private property within the village limits.

Order reversed.