## STATE ex rel. GEORGE T. SIMPSON v. COUNTY OF ST. LOUIS.[1]

January 26, 1912.

Nos. 17,454—(232).

**Act constitutional.**

     Chapter 248 of Laws of 1895 is not in contravention of section 33, art. 4, of the Constitution.

**Boundary of county.**

     *Held*, that acquiescence by the state and the counties of St. Louis and Lake in the boundary line between said counties, as located and fixed by said act, for fifteen years, precludes inquiry into the correctness of such location.

[1]Reported 134 N. W. 299.

On information of the attorney general, in behalf of the state, this court issued its writ of quo warranto directing the county of St. Louis to appear and show by what warrant it assumed to exercise jurisdiction over the territory lying east of the boundary between the counties of St. Louis and Lake, as fixed by the act of 1895 (c. 248). The respondent's answer, among other matters, alleged that the mouth of Knife river, where it empties into Lake Superior, at the time of the creation of St. Louis county, was, and at the present time is, located at a point approximately one mile easterly from the dividing line between ranges 11 and 12 west, and that the act in question was unconstitutional and void, being in conflict with Const. art. 4, § 33, as amended in 1892. The reply denied that the mouth of the Knife river was as alleged and averred it was approximately three quarters of a mile east of the dividing line between the ranges mentioned. Ordered that a writ of ouster issue.

*George T. Simpson,* Attorney General, and *B. F. Fowler,* County Attorney, for relator.

*Charles E. Adams,* for respondent.

HOLT, J.

Upon the information filed in this court by the attorney general of the state in its behalf, a writ was issued directing the respondent, the county of St. Louis, to show by what warrant it exercised jurisdiction and control of a part of the territory belonging to Lake county. The respondent has answered, and the relator replied. Upon the admission contained in the pleadings, each party claims a decision in its favor.

The admitted facts are these: The counties of Lake and St. Louis have for more than fifty years last past been political corporate subdivisions of the state, being established under and by virtue of the provisions of chapter 35 of the General Laws of the Territory of Minnesota for 1856 [p. 63], wherein the westerly boundary line of Lake county is described thus: "That so much of Minnesota territory as lies east of a line commencing at the mouth of Knife river on the north shore of Lake Superior, and running due north to the

boundary line between the United States and the British possessions, shall be and is hereby erected into a separate county, which shall be known by the name of Lake." The east boundary of St. Louis county is in the same act made coincident with the west boundary line of Lake county. From the time of the organization and up to 1895, St. Louis county assumed jurisdiction of a strip of territory lying between the line dividing range 12 west and range 11 west and a line drawn parallel and one mile to the east thereof. The respondent asserts that the mouth of the Knife river is approximately one mile east of the line dividing said ranges 11 and 12, while the relator claims the distance to be no more than three-fourths of a mile. The legislature, by chapter 248 of the General Laws of 1895, [p. 622] entitled "An act to define the boundary between the counties of St. Louis and Lake," defined the boundary line between these counties to be coincident with the line known as the true meridian; the same being the line dividing range 11 west from range 12 west.

Respondent admits that at all times subsequent to the passage of this act, and up to December, 1910, the county of Lake has actually had complete control of and exercised jurisdiction in every way over all the territory lying east of the easterly boundary line of said range 12, and that the exercise of such jurisdiction and control of said territory, and the whole thereof, by said Lake county, ever since the month of April, 1895, has been recognized and acquiesced in by the state of Minnesota. It further admits that the exercise of such jurisdiction and control over the said territory by said Lake county, and the right so to do, has been recognized and acquiesced in by the county of St. Louis, and the said line between the said ranges 11 and 12 has been recognized and acquiesced in by the last-named county as the true boundary line between said counties ever since 1895, and until December, 1910.

The respondent further admits that since the last-named date it has been and is now claiming that said range line between ranges 11 and 12 is not the true boundary line between it and Lake county, and asserts that since December, 1910, it has been exercising jurisdiction and control over a strip of land about one mile in width off of and

along the west side of said range 11 west, extending from the south boundary line of township 62 north to the north boundary line of township 64 north, containing in the aggregate eleven thousand acres of land, and that it will continue to attempt to exercise such jurisdiction over the same; that being the same territory described in the information as part of the territory of Lake county.

In this proceeding the respondent contends that the act of the territorial legislature of 1856 fixed the boundary line between the counties of St. Louis and Lake as the line due north from the mouth of Knife river, and that after the adoption of the constitutional amendment the legislature had no power by special act to change the boundary line of counties. Hence chapter 248 of the Laws of 1895, which, it is claimed, attempted to change the boundary between these counties, comes within the constitutional inhibition, and is of no effect. Respondent also asserts that the only other ground on which the right of Lake county to the territory in question could be based is untenable, namely, that the exercise of de facto jurisdiction for fifteen years, with the knowledge and acquiescence of the state and St. Louis county, will preclude the rights of Lake county to the territory from being questioned.

The principle is too well established to need citation of authorities that courts must assume that legislative enactments are valid until it appears beyond a reasonable doubt that they unavoidably contravene some provision of the Constitution. Section 33 of article 4 of the Constitution forbids the legislature to change county lines by special act. Does chapter 248 of the Laws of 1895 change, or purport to change, this county line? The act does not purport so to do, and it does not seem necessary to hold that such is in fact the effect thereof. It reads:

"An act to define the boundary between the counties of St. Louis and Lake.

"Whereas, it is represented to the legislature that the boundary between the counties of St. Louis and Lake has no permanent loca-

tion and that great inconvenience has resulted and is likely to result because of the indefiniteness thereof; therefore

"Be it enacted by the Legislature of the state of Minnesota:

"Section 1. That the boundary line between the counties of St. Louis and Lake be and is hereby defined to be coincident with the line known as the true meridian; the same being the line dividing range eleven (11) west from range twelve (12) west; and that this definition thereof shall be taken and accepted in all courts and places whatsoever as the true intent and meaning of that part of the act of the legislature of the territory of Minnesota which ordains that the said boundary line shall begin at the mouth of Knife river and extend due north therefrom."

When the territorial act was passed creating and defining the boundary of Lake county, little care was taken to fix the boundary line between it and St. Louis county. The mouth of Knife river was made the starting point, and the division line ran due north. Where the mouth of a river may be several hundred feet wide, and the channel or center thereof may vary, the starting point is somewhat uncertain. From admissions made at the argument it is clear that it does not coincide with the boundaries of any government description of land, and also that St. Louis county had in fact assumed to exercise jurisdiction beyond and east of the starting point; that is, for one mile east of the range line, although three-fourths of a mile east more nearly coincides with the center of the mouth of Knife river. The course due north, given in the act of 1856, construed in accordance with the decisions at that time, would mean due north according to the magnetic meridian instead of the true meridian. See note to Wells v. Jackson (47 N. H. 235) in 90 Am. Dec. 575.

It is also apparent how necessary it was for the security of land titles to know in what county conveyances affecting lands contiguous to this boundary line should be recorded. In this situation in 1895, when the country near this line began to develop and property rights of both private individuals and public bodies corporate became more valuable, it certainly became important that any vagueness or am-

biguity in the county boundary line should be settled. No general law for this purpose existed at that time; and it would seem not necessary to hold that, by making the boundary line, which had been left floating and uncertain, fixed and definite, thereby such boundary line was changed. There was a boundary line between the counties of Lake and St. Louis, but its exact location was uncertain. To fix and locate this line is not equivalent to changing it from one definite location to another. It is therefore not necessary to hold chapter 248, p. 622, Laws of 1895, void, because prohibited by section 33, art. 4, of the Constitution.

But, even were it conceded that the act of 1895 referred to comes under the constitutional prohibition, the undisputed facts show that the true boundary line must now be taken to be the line dividing range 11 from range 12. It cannot be questioned that the legislative department of the state, by chapter 248 of the Laws of 1895, recognized this line as the true boundary. Notice of this recognition was given to the officials and citizens of the state through the publication of the law. The executive department of the state had recognized the territory now in dispute ever since as a part of Lake county in the taxes collected and dealings had with the counties involved and with the towns and school districts in the affected territory; and no doubt some part of the judiciary branch of the state government has also had occasion during these fifteen years to recognize the dividing range line as the county boundary line.

We must take judicial notice of the conduct of affairs in an organized county. Township organizations exist, road districts are formed, school districts are established, all according to definite fixed lines within the county. It is indispensable that there be absolute certainty in regard to the location of any property in a governmental division or subdivision, so that it may be subject to its proper taxes, and that the residents in a territory may definitely know where their privileges may be exercised and their burdens discharged. We may also take notice of the fact that since 1895 there has been a marked and rapid development in portions of both of these counties, and in at least parts of this disputed territory. During fifteen years

road and school districts and township organizations have been adjusted and have been operated on the basis that the range line mentioned is the division line between the counties.

We may assume that the county, the towns, and school districts involved have, by the erection of public buildings and schools and the construction of roads and bridges, incurred liabilities to meet which taxes have been collected, and were intended hereafter to be collected, on the supposition that the territory now sought to be detached by St. Louis county was part of Lake county. Add to this the interest of private individuals holding conveyances to lands located east of this range line, and who have had these recorded in Lake county. The confusion and injustice that would arise if, after fifteen years of undisturbed conduct and development of the affairs in the county, a change in the territorial limits were now made, forbids the consideration of the claim that the range line mentioned is not the true boundary line.

The respondent admits that Lake county has, since the passage of the act of 1895, actually had complete control of and exercised jurisdiction in every way over the whole territory embraced between the line dividing said ranges 11 and 12 and a line drawn parallel thereto and one mile east thereof, except that portion lying between the south boundary of township 62 and north boundary of township 64, which in December, 1910, St. Louis county undertook to take jurisdiction over, and, further, that the state of Minnesota has, during all that time, recognized and acquiesced in the right of Lake county so to do as to the whole of said strip of one mile in width, and also that respondent so recognized and acquiesced in the action of Lake county, with the exception noted as to eleven thousand acres thereof in townships 62, 63, and 64 since December, 1910.

We hold that such recognition and acquiescence should now estop both the state and St. Louis county from claiming that any territory east of the range line between the two ranges mentioned is within the jurisdiction of St. Louis county. State v. Village of Harris, 102 Minn. 340, 113 N. W. 887, 13 L.R.A.(N.S.) 533, State v. School District, 85 Minn. 230, 88 N. W. 751, State v. Olson, 107

Minn. 136, 119 N. W. 799, 21 L.R.A.(N.S.) 685, and People v. Alturas, 6 Idaho, 418, 55 Pac. 1067, 44 L.R.A. 122, announce this principle of estoppel which we consider applicable to the facts in this proceeding.    See also Edwards County v. White County, 85 Ill. 390, where this pertinent language is used:

"If the language of the statute were more ambiguous than we conceive it to be, it would still be competent, in solving the doubt, to consider the acts of the public authorities in recognition of the boundary line; and, upon principles of public policy, where, as here, courts, assessors, and collectors of taxes, and other officers having duties, limited to the respective counties, to perform, have for a long time recognized and acted upon the assumption that a given line is the true boundary line between the counties, we shall not inquire whether, in the first instance, the line was the one intended or not.    The quiet and good order of communities ought not to be disturbed by controversy in regard to such questions, after at least the expiration of the period fixed for the limitation of actions between individuals where title to real estate is controverted; and this, not because in such a controversy counties are necessarily within the contemplation of the statute of limitations, but because the public welfare forbids that the possibility of strife and controversy in regard to boundary lines between counties should continue indefinitely. The principle is recognized in" Hamilton v. McNiel, 13 Grattan, 389, and Hecker v. Sterling, 36 Pa. St. 423.

Our conclusion is that a writ of ouster must issue against the respondent.    So ordered.